# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

In re:

Richard Church
    Debtor(s).

Case No. 8:15-bk-00295-MGW

Chapter 7 Case

**CHRISTIANA TRUST, A DIVISION OF WILMINGTON SAVINGS FUND SOCIETY, FSB, AS TRUSTEE FOR NORMANDY MORTGAGE LOAN TRUST, SERIES 2013-18 MOTION FOR RELIEF FROM THE AUTOMATIC STAY (SURRENDERED PROPERTY)**

## NOTICE OF OPPORTUNITY TO OBJECT AND FOR HEARING

Pursuant to Local Rule 2002-4, the Court will consider this motion, objection, or other matter without further notice or hearing unless a party in interest files a response within 21 days from the date set forth on the proof of service attached to this paper plus 3 additional days for service. If you object to the relief requested in this paper, you must file your response with the Clerk of the Court at Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, Suite 555, Tampa, Florida 33602 and serve a copy on the movant's attorney, Alexandra Kalman, Esq., at Lender Legal Services, LLC, 201 E. Pine Street, Suite 730, Orlando, FL 32801.

If you file and serve a response within the time permitted, the Court may schedule and notify you of a hearing, or the Court may consider the Response and may grant or deny the relief requested without a hearing. If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, will proceed to consider the paper without further notice or hearing, and may grant the relief requested.

**COMES NOW**, Christiana Trust, A Division of Wilmington Savings Fund Society, FSB, as Trustee for Normandy Mortgage Loan Trust, Series 2013-18, its Successors and/or Assigns ("Secured Creditor"), by and through its undersigned counsel, as and for its Motion for Relief from the Automatic Stay, and states as follows:

1. The Court has jurisdiction over this matter pursuant to 11 U.S.C. § 362, FRBP 4001(a) and the various other applicable provisions of the United States Bankruptcy Code, Federal Rules of Bankruptcy Procedure and the laws of the United States of America.

2. The Debtor(s) filed a voluntary petition pursuant to Chapter 7 of the Bankruptcy Code on January 13, 2015.

3. Secured Creditor holds a security interest in the Debtor(s)' real property located at 1724 Franklin Dr., Englewood, FL 34223, by virtue of a Mortgage which is recorded in the Public Records of SARASOTA County, Florida instrument number 2007069209 (21pages). Said Mortgage secures a Note in the amount of $304,336.00. Copies of the relevant loan documents are attached hereto as Exhibit "A".

4. The aforementioned Mortgage gives Secured Creditor a first mortgage position on property legally described as:

> **A PARCEL OF LAND LYING IN SECTION 10, TOWNSHIP 40 SOUTH, RANGE 19 EAST, SARASOTA COUNTY, FLORIDA, DESCRIBED AS FOLLOWS:**
>
> **COMMENCE AT THE SOUTHEAST CORNER OF FRANKLIN DRIVE (A FIFTY FOOT WIDE PUBLIC RIGHT OF WAY) AS SHOWN ON THE PLAT OF MANASOTA MANOR, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 6, PAGE(S) 14, OF THE PUBLIC RECORDS OF SARASOTA COUNTY, FLORIDA; THENCE S 89° 53' 40" EAST, ALONG THE SAID SOUTH LINE OF THE NW 1/4 OF THE NW 1/4 OF SECTION 10. TOWNSHIP 40 SOUTH, RANGE 19 EAST, SARASOTA COUNTY, FLORIDA, A DISTANCE OF 175.00 FEET TO THE POINT OF BEGINNING: THENCE CONTINUE ALONG THE SOUTH LINE OF SAID NORTHWEST 1/4 OF THE NORTHWEST 1/4 OF SECTION 10, S 89° 53' 40" E., A DISTANCE OF 155.00 FEET; THENCE N 00° 31' 05" E., LEAVING SAID SOUTH LINE OF THE NORTHWEST 1/4 OF THE NORTHWEST 1/4 OF SECTION 10, A DISTANCE OF 330.01 FEET; THENCE N 89° 53' 40" W., PARALLEL WITH SAID SOUTH LINE OF THE NORTHWEST 1/4 OF**

THE NORTHWEST 1/4 OF SECTION 10, A DISTANCE OF 155.00 FEET; THENCE S 00° 31' 05' W., A DISTANCE OF 330.01 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH A 40.00 FOOT WIDE INGRESS/EGRESS, UTILITY AND DRAINAGE EASEMENT ACROSS THE SOUTH 40.00 FEET, AS MEASURED PERPENDICULAR TO THE SOUTH LINE OF LANDS OF THE FOLLOWING DESCRIBED LAND BEGIN AT THE SOUTHEAST CORNER OF FRANKLIN DRIVE (A FIFTY FOOT WIDE PUBLIC RIGHT-OF-WAY) AS SHOWN ON THE PLAT OF MANASOTA MANOR, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 6, PAGE 14, OF THE PUBLIC RECORDS OF SARASOTA COUNTY. FLORIDA: THENCE N. 00°31'05" E., ALONG THE EAST LINE OF SAID PLAT OF MANASOTA MANOR, A DISTANCE OF 330.01 FEET; THENCE S. 89°53'40" E., PARALLEL WITH THE SOUTH LINE OF THE NORTHWEST 1/4 OF THE NORTHWEST 1/4 OF SECTION 10, TOWNSHIP 40 SOUTH, RANGE 19 EAST, SARASOTA COUNTY, FLORIDA, A DISTANCE OF 175.01 FEET; THENCE S. 00°31'05" W. PARALLEL WITH SAID EAST LINE OF MANASOTA MANOR, A DISTANCE OF 330.01 FEET TO SAID SOUTH LINE OF THE NORTHWEST 1/4 OF THE NORTHWEST 1/4 OF SECTION 10; THENCE N. 89°53'40" W., ALONG THE SAID SOUTH LINE OF THE NORTHWEST 1/4 OF THE NORTHWEST 1/4 OF SECTION 10, A DISTANCE OF 175.01 FEET TO THE POINT OF BEGINNING.
TOGETHER WITH ANY INTEREST IN THE FOLLOWING DESCRIBED PROPERTY:

FRANKLIN DRIVE, 50 FEET SOUTH OF LOT 18, OF MANASOTA MANOR, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 6, PAGE(S) 14, OF THE PUBLIC RECORDS OF SARASOTA COUNTY, FLORIDA.

5.  Upon information and belief, said property has not been claimed exempt by the

    Debtor(s).

6.  The Debtor(s) is/are indebted to Secured Creditor in the amount of $304336.00 principal

    balance, with interest accruing at the rate of 6.25 per cent, plus other fees and costs

advanced by the mortgagee pursuant to the loan documents. See Exhibit "B" attached hereto.

7. Payments pursuant to the aforementioned Mortgage have been in default, and remain in default, since December 1, 2008. The Debtor(s) has/have surrendered the property in the Debtor(s)' Statement of Intentions.

8. Thus, the Debtor(s) has/have failed to adequately protect the interest of Secured Creditor.

9. Secured Creditor's security interest in the subject property is being significantly jeopardized by the Debtor(s)' failure to make regular payments under the subject loan documents while Secured Creditor is prohibited from pursuing lawful remedies to protect such security interest.

10. Furthermore, according to the SARASOTA County Property Appraiser, the estimated value of the property is $398,700. See Exhibit "C", attached hereto. Thus, there is no equity in the property for the benefit of unsecured creditors of the estate.

11. Therefore, Secured Creditor maintains that cause exists pursuant to 11 U.S.C. § 362(d)(1) for the automatic stay to be lifted.

12. Secured Creditor further requests that the Court Order entered pursuant to the instant Motion provide that all communications sent by the Secured Creditor in connection with proceeding against the property including, but not limited to, notices required by state law and communications to offer and provide information with regard to a potential Forbearance Agreement, Loan Modification, Refinance Agreement, Loss Mitigation Agreement or other Loan Workout, may be sent directly to the Debtor.

13. Pursuant to 11 U.S.C. § 362(e), Secured Creditor hereby requests that in the event a hearing is necessary, that said hearing be held within thirty (30) days.

14. Secured Creditor respectfully requests that the Court waive the fourteen (14) day stay of the Order Granting Relief pursuant to Bankruptcy Rule 4001(a)(3), so that Secured Creditor can pursue its in rem remedies without further delay.

**WHEREFORE**, Secured Creditor respectfully requests that the automatic stay be lifted so that Secured Creditor may be permitted to pursue *in rem* remedies outside of the bankruptcy forum, that in the event that a hearing is necessary on this Motion that said hearing be held within thirty (30) days, and for such other further relief as the Court may deem just and proper.

Respectfully submitted:

/s/ Alexandra Kalman, Esq.
Alexandra Kalman
FBN 109137
Lender Legal Services, LLC
Attorney for Secured Creditor
201 E. Pine Street, Suite 730
Orlando, FL 32801
Phone: (407) 730-4644
Fax: (888) 337-3815
akalman@lenderlegal.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Motion for Relief

from the Automatic Stay was either sent electronically or by U.S. mail, first-class postage pre-

paid, to:

Richard Church
2357 S Tamiami Trl #119
Venice, FL 34293

Laurie L Blanton
Fitzhugh & Blanton, P.A.
1041 US 41 Bypass S
Venice, FL 34285

Trustee
Richard M Dauval
P.O. Box 13607
St. Petersburg, FL 33733-3607

U.S. Trustee
United States Trustee - TPA7/13
Timberlake Annex, Suite 1200
501 E Polk Street
Tampa, FL 33602

on February 13, 2015.

Respectfully submitted:

/s/ Alexandra Kalman
Alexandra Kalman
FBN 109137
Lender Legal Services, LLC
Attorney for Secured Creditor
201 E. Pine Street, Suite 730
Orlando, FL 32801
Phone: (407) 730-4644
Fax: (888) 337-3815
akalman@lenderlegal.com



**Exhibit** _A_

28FL
M28



# ADJUSTABLE RATE NOTE
### (One-Year LIBOR Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

APRIL 24, 2007                MILWAUKEE,                          WISCONSIN
   [Date]                       [City]                              [State]

1724 FRANKLIN DRIVE, ENGLEWOOD, FL 34223.
                [Property Address]

**1.  BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $    304,336.00    (this amount is called "Principal"), plus interest, to the order of Lender. Lender is    WASHINGTON MUTUAL BANK, FA

I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.250    %. The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.  PAYMENTS**
**(A) Time and Place of Payments**
I will make a payment on the first day of every month, beginning on    JUNE 01, 2007    . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.
I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on    MAY 01, 2037    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at    P.O.BOX 78148 PHOENIX, AZ 85062-8148

or at a different place if required by the Note Holder.
**(B) Amount of My Initial Monthly Payments**
My monthly payment will be in the amount of U.S. $    1,585.08    before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

---

FLORIDA ADJUSTABLE RATE NOTE - ONE-YEAR LIBOR INDEX - Single Family

W170NFL (0407)                VMP Mortgage Solutions, Inc. (800)521-7291                Initials: _KC_

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of MAY 01, 2012                , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 25/100 percentage points (          2.250   %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    11.250       % or less than    2.250       %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than    11.250       %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

W170NFL (0407)                              Page 2 of 5                              Initials: _____

6. **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7. **BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8. **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9. **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10. **WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)    _____ (Seal)
RICHARD C CHURCH            -Borrower                              -Borrower

_____ (Seal)    _____ (Seal)
                            -Borrower                              -Borrower

_____ (Seal)    _____ (Seal)
                            -Borrower                              -Borrower

_____ (Seal)    _____ (Seal)
                            -Borrower                              -Borrower

*(Sign Original Only)*

W170NFL (040/)                      Page 6 of 3

21

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2007069209 21 PGS
2007 APR 30 12:28 PM
KAREN E. RUSHING
CLERK OF THE CIRCUIT COURT
SARASOTA COUNTY,FLORIDA
LBLEHAR  Receipt#914583
Doc Stamp-Mort:  1,065.40
Intang. Tax:      608.67

Return To:

Chicago Title ██████
ServiceLink Division
4000 Industrial Blvd
Aliquippa, PA 15001

This document was prepared by:

RON BETARIE
Washington Mutual Bank FA
9451 Corbin Avenue
Northridge, CA 91324

——————— {Space Above This Line For Recording Data} ———————

ZFL1
M28

# MORTGAGE

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated  APRIL 24, 2007
together with all Riders to this document.
**(B) "Borrower"** is  RICHARD C CHURCH ,A MARRIED PERSON TO CHRISTINE CHURCH, H/W

1724 FRANKLIN DRIVE, ENGLEWOOD, FL 34223
Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is  WASHINGTON MUTUAL BANK, FA

Lender is a  FEDERAL SAVINGS BANK
organized and existing under the laws of  THE UNITED STATES OF AMERICA

FLORIDA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01

⟋⟋–6(FL) (0005)
Page 1 of 16          Initials:_____
VMP MORTGAGE FORMS - (800)521-7291

Lender's address is 2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV 89014

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated APRIL 24, 2007
The Note states that Borrower owes Lender THREE HUNDRED FOUR THOUSAND THREE HUNDRED THIRTY SIX AND 00/100                                                                    Dollars
(U.S. $   304,336.00       ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MAY 01, 2037

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

VMP®-6(FL) (0005)                                    Page 2 of 16                    Initials: _____                    Form 3010 1/01

# Exhibit "A"
# Legal Description

All that certain parcel of land situate in the County of Sarasota and State of Florida, being known and designated as follows:

Parcel "A":

A parcel of land lying in Section 10, Township 40 South, Range 19 East, Sarasota County, Florida, described as follows:

Commence at the Southeast corner of Franklin Drive (a 50 foot wide Public Right of Way) as shown on the Plat of Manasota Manor, according to the plat thereof, as recorded in Plat Book 6, Page 14, of the Public Records of Sarasota County, Florida; thence S 89° 53' 40" E, along the said South line of the NW 1/4 of the NW 1/4 of Section 10, Township 40 South, Range 19 East, Sarasota County, Florida, a distance of 175.00 feet to the Point of Beginning; thence continue along the South line of said Northwest 1/4 of the Northwest 1/4 of Section 10, S 89° 53' 40" E., a distance of 155.00 feet; thence N 00° 31' 05" E., leaving said South line of the Northwest 1/4 of the Northwest 1/4 of Section 10, a distance of 330.01 feet; thence N 89° 53' 40" W., parallel with said South line of the Northwest 1/4 of the Northwest 1/4 of Section 10, a distance of 155.00 feet; thence S 00° 31' 05" W., a distance of 330.01 feet to the Point of Beginning.

Together with a 40.00 foot wide Ingress/Egress, Utility and Drainage Easement across the South 40.00 feet, as measured perpendicular to the South line of lands of Deed Instrument No. 2004228411.

Together with any interest in the following described property:

Franklin Drive, 50 feet South of Lot 18, of Manasota Manor, according to the plat thereof, as recorded in Plat Book 6, Page 14, of the Public Records of Sarasota County, Florida.

Tax ID:   0477-05-0013

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the

| COUNTY | of | SARASOTA |
|--------|----|----|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

**THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT AND IS MADE A PART HEREOF.**

Parcel ID Number: 0477-05-0013                     which currently has the address of
1724 FRANKLIN DRIVE                                                            [Street]
ENGLEWOOD                           [City], Florida 34223        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

Initials: _____

-6(FL) (0005)                              Page 3 of 16                    Form 3010 1/01

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be

Initials: _____

-6(FL) (0005)                    Page 4 of 15                    Form 3010 1/01

applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

-6(FL) (0005)                    Page 5 of 16                    Initials: _____    Form 3010 1/01

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of

-6(FL) (0005)    Page 6 of 16    Initials: _____    Form 3010 1/01

the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the

date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate

-6(FL) (0005)                    Page 9 of 16                    Initials: _____    Form 3010 1/01

from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any**

other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the

-6(FL) (0005)    Page 10 of 16    Initials: _LCC_  _CC_    Form 3010 1/01

Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security

Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums

-6(FL) (0005)                         Page 12 of 16                Initials: _____    Form 3010 1/01

which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

-6(FL) (0005)    Page 13 of 16    Initials: _____    Form 3010 1/01

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Attorneys' Fees. As used in this Security Instrument and the Note, "attorneys' fees" shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. Jury Trial Waiver. The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

-6(FL) (0008)                                   Page 14 of 16                        Initials: _____        Form 3010 1/01

ZFL2

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_Jenifer J Bady Withers_

_____ (Seal)
                                                    -Borrower
RICHARD C CHURCH

                                                    (Address)

_____ (Seal)
                                                    -Borrower
CHRISTINE CHURCH

                                                    (Address)

_____ (Seal)          _____ (Seal)
                        -Borrower                                -Borrower

(Address)                                (Address)

_____ (Seal)          _____ (Seal)
                        -Borrower                                -Borrower

(Address)                                (Address)

_____ (Seal)          _____ (Seal)
                        -Borrower                                -Borrower

(Address)                                (Address)

-8(FL) (0005)              Page 15 of 16              Form 3010 1/01

STATE OF FLORIDA,    SARASOTA                    County ss:
The foregoing instrument was acknowledged before me this 4/24/07

by RICHARD C CHURCH

CHRISTINE CHURCH H/W.

who is personally known to me or who has produced _drivers license_ as identification.

_____
Notary Public

JENIFER J. BAEHR
Notary Public - State of Florida
My Commission Expires Oct 27, 2009
Commission # DD 486334
Bonded By National Notary Assn.

-6(FL) (0005)                    Page 18 of 18            Initials: _____    Form 3010 1/01

R2US
M26

# FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this          24TH          day of APRIL, 2007          , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to WASHINGTON MUTUAL BANK, FA

("Lender") of the same date and covering the property described in the Security Instrument and located at:

1724 FRANKLIN DRIVE
ENGLEWOOD, FL 34223
(Property Address)

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of          6.250          %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of MAY 01, 2012          , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family -
Fannie Mae Uniform Instrument                                    Form 3187 6/01
-168R (0401)
Page 1 of 4     Initials:
VMP Mortgage Solutions
(800)521-7291

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding    TWO AND 25/100              percentage points (      2.250      %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than  11.250            % or less than    2.250            %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding  12  months. My interest rate will never be greater than      11.250      %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Initials:

GMD -168R (0401)                    Page 2 of 4                    Form 3187 6/01

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)                    _____ (Seal)
          -Borrower                                          -Borrower
                                                   RICHARD C CHURCH

_____ (Seal)                    _____ (Seal)
          -Borrower                                          -Borrower
                                                   CHRISTINE CHURCH

_____ (Seal)                    _____ (Seal)
          -Borrower                                          -Borrower

_____ (Seal)                    _____ (Seal)
          -Borrower                                          -Borrower

-168R (0401)                    Page 4 of 4                    Form 3187 6/01

**Prepared By:**
William H. Peirson
PeirsonPatterson, LLP
13750 Omega Road
Dallas, TX 75244
800-899-9027

**Recording requested by and**
**When recorded return to: LSI**
**Custom Recording Solutions**
**5 Peters Canyon Road, Ste. 200**
**Irvine, CA  92606**
**(800) 756-3524 ext. 5011**

**Loan No.:** ▮▮▮▮▮▮▮

**CRS Order No.:** ▮▮▮▮▮▮

RECORDED IN OFFICIAL RECORDS
INSTRUMENT #2014006799       4  PG

01/21/2014 08:08:42 AM
KAREN E. RUSHING
CLERK OF THE CIRCUIT COURT
SARASOTA COUNTY, FLORIDA
CSC              Receipt # 1702870

| | |
|---|---|
| Doc Stamp-Mort: | $0.00 |
| Doc Stamp-Deed: | $0.00 |
| Intang. Tax: | $0.00 |

# Assignment of Mortgage

After recording please return to:
PEIRSONPATTERSON, LLP
ATTN: RECORDING DEPT.
13750 OMEGA ROAD
DALLAS, TX 75244-4505

This document prepared by:
PEIRSONPATTERSON, LLP
WILLIAM H. PEIRSON
13750 OMEGA ROAD
DALLAS, TX 75244-4505

Tax Parcel ID No.: 0477-05-0013

————————————*[Space Above This Line For Recording Data]*————————————

Loan No.: ▮▮▮▮▮

# FLORIDA ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned holder of a Mortgage (herein "Assignor") does hereby grant, sell, assign, transfer and convey, unto **Christiana Trust, a Division of Wilmington Savings Fund Society, FSB, as trustee for Normandy Mortgage Loan Trust, Series 2013-18,** (herein "Assignee"), whose address is **1610 East St. Andrew Place, Suite B150H, Santa Ana, CA  92705,** a certain Mortgage dated **April 24, 2007** and recorded on **April 30, 2007,** made and executed by **RICHARD C. CHURCH AND CHRISTINE CHURCH** to and in favor of **WASHINGTON MUTUAL BANK, FA,** upon the following described property situated in **SARASOTA** County, State of Florida:
Property Address: **1724 FRANKLIN DRIVE, ENGLEWOOD, FL 34223**

**See exhibit "A" attached hereto and made a part hereof.**

such Mortgage having been given to secure payment of **Three Hundred Four Thousand Three Hundred Thirty Six and 00/100ths ($304,336.00),** which Mortgage is of record in Book, Volume or Liber No. N/A, at Page N/A (or as No. 2007069209), in the Recorder's Office of **SARASOTA** County, State of Florida.

TO HAVE AND TO HOLD, the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Mortgage.

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Mortgage on _1-4-2014_.

Assignor:
**JPMorgan Chase Bank, National Association, successor in interest by purchase from the Federal Deposit Insurance Company as Receiver of Washington Mutual Bank F/K/A Washington Mutual Bank, FA**

By: _____

**Denise Henderson
Vice President**

Its: _____

### ACKNOWLEDGMENT

State of **Louisiana**                                        §
                                                             §
Parish of **Ouachita**                                        §

On this _4_ day of _January 2014_, before me appeared _Denise Henderson_, to me personally known, who, being by me duly sworn (or affirmed) did say that he/she is the _Vice President_, of JPMorgan Chase **Bank, National Association, successor in interest by purchase from the Federal Deposit Insurance Company as Receiver of Washington Mutual Bank F/K/A Washington Mutual Bank, FA**, and that the seal affixed to said instrument is the corporate seal of said national association and that the instrument was signed and sealed on behalf of the national association by authority of its board of directors and that _Denise Henderson_ acknowledged the instrument to be the free act and deed of the national association.

_____
Signature of Person Taking Acknowledgment

_Y K Wilson_
Name Type, Printed or Stamped

_Notary Public_
Title and Rank

Serial Number, if any: _NA_

My Commission Expires: _Lifetime_

Y. K. WILSON
OUACHITA PARISH, LOUISIANA
LIFETIME COMMISSION
NOTARY ID# 064399

(Seal)

Exhibit "A"

All that certain parcel of land situate in the County of Sarasota and State of Florida, being known and designated as follows:

Parcel "A":

A parcel of land lying in Section 10, Township 40 South, Range 19 East, Sarasota County, Florida, described as follows:

Commence at the Southeast corner of Franklin Drive (a 50 foot wide Public Right of Way) as shown on the Plat of Manasota Manor, according to the plat thereof, as recorded in Plat Book 6, Page 14, of the Public Records of Sarasota County, Florida; thence S 89° 53' 40" E, along the said South line of the NW 1/4 of the NW 1/4 of Section 10, Township 40 South, Range 19 East, Sarasota County, Florida, a distance of 175.00 feet to the Point of Beginning; thence continue along the South line of said Northwest 1/4 of the Northwest 1/4 of Section 10, S 89° 53' 40" E., a distance of 155.00 feet; thence N 00° 31' 05" E., leaving said South line of the Northwest 1/4 of the Northwest 1/4 of Section 10, a distance of 330.01 feet; thence N 89° 53' 40" W., parallel with said South line of the Northwest 1/4 of the Northwest 1/4 of Section 10, a distance of 155.00 feet; thence S 00° 31' 05' W., a distance of 330.01 feet to the Point of Beginning.

Together with a 40.00 foot wide Ingress/Egress, Utility and Drainage Easement across the South 40.00 feet, as measured perpendicular to the South line of lands of Deed Instrument No. 2004228411.

Together with any interest in the following described property:

Franklin Drive, 50 feet South of Lot 18, of Manasota Manor, according to the plat thereof, as recorded in Plat Book 6, Page 14, of the Public Records of Sarasota County, Florida.

Tax ID:  0477-05-0013

# Exhibit  B

```
BNK1 0010087930    ____        BNK SETUP    A FID 38A/001   01/19/15  15:18:29
RC CHURCH    CHAPTER 07         12/01/08 TYPE CONV. RES.    ARM        M:B F:4
1724 FRANKLIN DR ENGLEWOOD FL 34223                                    GRP
~STAT------------------------* STATUS *----------------------------------
STAT   PROC   CHAP   FILING DI   BANKRUPTCY CASE #      COURT        TEMPLATE
 A     FID    07     011315      15-00295              CTFLTAMP      CHAP7
 NOTICE     CREDITOR    PF OF CLM    CONFIRM    REPAY   STAY   PMTS   ASSET CONV
 RECEIVED   MEETING     FILING       HEARING    PER     LIFT   INSIDE CASE DATE
 011415                                                  N      N     N
  TRUSTEE      MTG CO ATTY    DEBTOR ATTY      REGION CODE
 TRFLDAUVAL                  DAFLBLANTO          00
--------------------------* ADDITIONAL MESSAGES *------------------------------
*** LOAN IS SUSPENDED FORECLOSURE ***  ACTIVE CH 7 BANKRUPTCY
DIST-TYPE = 1 INTEREST-ONLY LOAN
LOAN IS IN FORECLOSURE, F/C STOP = 4    PROC STOP = B  BANKRUPTCY
-----~DESC----------------* BNK DESCRIPTIONS *--------------------------------
 BNK STATUS:  ACTIVE              RMVL REAS:
    CHAPTER:  07                  RMVL DATE:
 FOR1 STATUS:  SUSPEND            PREPT DUE: 12-01-08
    TEMPLATE:  CHAPTER 7 BANKRUPTCY   PSTPT DUE: 12-01-08
 MTG CO ATTY:                     BNK SETUP: 01-19-15
                                  FILING DT: 01-13-15
  PROP INSP:  SAFEGUARD PROPERTIES   PROCESSOR: FIDELITY MANAGED
```

```
BNK1 0010087930    APR1      BNK SETUP      A FID 38A/001   01/19/15  15:18:29
RC CHURCH    CHAPTER 07           12/01/08 TYPE CONV. RES.     ARM     M:B F:4
1724 FRANKLIN DR ENGLEWOOD FL 34223                                   GRP
~STAT-----------------------------* STATUS *---------------------------------
STAT   PROC   CHAP   FILING DT   BANKRUPTCY CASE #     COURT        TEMPLATE
 A     FID    07     011315      15-00295              CTFLTAMP     CHAP7
 NOTICE      CREDITOR    PF OF CLM   CONFIRM    REPAY  STAY  PMTS  ASSET CONV
 RECEIVED    MEETING     FILING      HEARING    PER    LIFT  INSIDE CASE DATE
 011415                                                N     N     N
 TRUSTEE      MTG CO ATTY   DEBTOR ATTY     REGION CODE
 TRFLDAUVAL                 DAFLBLANTO       00
-------------------------* ADDITIONAL MESSAGES *-----------------------------
*** LOAN IS SUSPENDED FORECLOSURE ***  ACTIVE CH 7 BANKRUPTCY
DIST-TYPE = 1 INTEREST-ONLY LOAN
LOAN IS IN FORECLOSURE, F/C STOP = 4    PROC STOP = B   BANKRUPTCY
----~DESC---------------------* BNK DESCRIPTIONS *---------------------------
 BNK STATUS:  ACTIVE            RMVL REAS:
    CHAPTER:  07                RMVL DATE:
FOR1 STATUS:  SUSPEND           PREPT DUE: 12-01-08
   TEMPLATE:  CHAPTER 7 BANKRUPTCY  PSTPT DUE: 12-01-08
MTG CO ATTY:                    BNK SETUP: 01-19-15
                                FILING DT: 01-13-15
  PROP INSP:  SAFEGUARD PROPERTIES    PROCESSOR: FIDELITY MANAGED
```

```
BNKC 0010087930  _____  BNKRUPTCY PROOF OF CLM CH 07 INV 38A 01/19/15 15:18:32
RC CHURCH    DUE 12/01/08  PMT   1,940.52 TYPE CONV. RES    ARM
1724 FRANKLIN DR          ENGLEWOOD FL 34223
---------------------------- PRE-PETITION CLAIM -----------------PRO FID-----
CLAIMED    ACKNOWLEDGED CONFIRMED    CLAIM TOT    CONFIRMED TOT   PRIN BALANCE
01-19-15                                .00 *            .00      304,336.00
REVISED CLAIM MONTH: MM/YY   PRE-PETITION CLAIM:  Y   CLAIM DETAIL OVERRIDE:  N
---------------- PAYMENTS ----------------  ---------- LATE CHARGES ---------
DUE DATE - DUE DATE    AMOUNT    TOTAL  NUM  AMOUNT    TOTAL  PD-TO-DT
```

```
BNKC 0010087930 _____  BNKRUPTCY PROOF OF CLM CH 07 INV 38A 01/19/15 15:18:34
RC CHURCH    DUE 12/01/08  PMT   1,940.52 TYPE CONV. RES    ARM
1724 FRANKLIN DR          ENGLEWOOD FL 34223
----------------------------- PRE-PETITION CLAIM -----------------PRO FID-----
CLAIMED    ACKNOWLEDGED CONFIRMED      CLAIM TOT   CONFIRMED TOT   PRIN BALANCE
01-19-15                                  .00 *            .00     304,336.00
REVISED CLAIM MONTH: MM/YY   PRE-PETITION CLAIM: Y   CLAIM DETAIL OVERRIDE:  N
---------------- PAYMENTS ----------------  ---------- LATE CHARGES ---------
DUE DATE - DUE DATE    AMOUNT     TOTAL  NUM   AMOUNT     TOTAL  PD-TO-DT



USER NOT AUTHORIZED TO ADD FEES TO CLAIM
```

```
 P192 LN 0010087930        L O A N   S T A T U S  2              01/19/15
NAME RC CHURCH     INV-LN 38A-001-7000063160 DUE 12-01-08 TYPE 13-A
BR CG MAN B P-TYPE 1 INT .0625000 FIRST PB    304,336.00  2ND PB          .00
MISCELLANEOUS                    STEP SERVICE FEES      SECOND MORTGAGE
EMPLOYEE CD              0        STEP1 AMT             INV/CAT              /
S294 SW                 0        STEP1 RATE            INV LN NO
L/I FLAG    RLIC ARM IND         STEP2 AMT             LOAN TYPE
COUPON MO              02        STEP2 RATE            MAN
NEXT PMT NO           19         STEP3 AMT             TERM
ASSUMP DATE    00-00-00          STEP3 RATE            NEXT PYMT
LAST INV CHG     12-08           STEP4 AMT             ANNUAL SF
DEFICIT START/STOP   00-00 06-37 STEP4 RATE            LEVEL SF
DEFICIT INC      146.64-                               2ND P&I
OLD TOT PMT         .00                                INT RATE
OLD ESCROW MTH      .00                                ORIG LOAN
1ST PRIN BEG    304336.00        AGENT NO              2ND PRIN BEG
ESCROW BEG         .00           LOCATION DATA
ADVANCE BEG     93403.19         STATE 09  COUNTY 115  CITY 0000
DRFT BANK/DELAY 00000000         SMSA      CENSUS          OCCUPY 1
DRAFT ACCT                       CRA COMM  LOW INC    MOD INC
DRAFT ADDL PRIN                  MINORITY COMM
MTGR REC CORP ADV    6185.68     3RD REC CORP ADV        375.62
NON-REC CORP ADV      .00             INT-ONLY FLAG Y EXPIRES 06-01-12
 PLEASE ENTER NEXT TRANSACTION   PXXX0010087930   SEE SCREEN P191
```

```
DLQ1 0010087930          QX   D E L I N Q U E N C Y  OWNR n/a 01/19/15  15:18:39
13-A CONV. RES. ARM          PER/CLS/OFF  B/ /CG AGE: 7Y  9M IR:  6.25000 INV: 38A
DUE( 74)  139,271.24  DUE 12/01/08( )(00/00) ASSUM:         ACQ:06/02/14
LATE CHRG     211.20  PAYMT    @   1,940.52 P: 1724 FRANKLIN DR
BAD CK FEES      .00  L/C AMT          79.25   ENGLEWOOD FL 34223
OTHER FEES       .00  PAYMT + LC    2,019.77 M:
TOT DUE   139,482.44* PRIN BAL    304,336.00
SUSPENSE         .00  P&I           1,585.08   2357 TAMIAMI TRL S UNIT 119
NET DUE   139,482.44  DLQ  3 TIME,PAY  0 DAY   VENICE FL 34293
C/S 584   RICHARD C CHURCH                           941-544-5411
C/D 07/14
 ---------------------------- * ADDITIONAL MESSAGES * ----------------WU: P ----
-IMD:N----------------------              ACTIVE CH 7 BANKRUPTCY
DIST-TYPE = 1 INTEREST-ONLY LOAN         SUSPENDED FORECLOSURE
CASHIER STOP 5
-COM2-----------------------* COMMENTS *----------------------------------------
 DATE  USR                   CONTACT RESPONSE REASON RECALL      F/B  REMIND

011615 *** < ORIGINAL OWNER      CONDITION ON 011615   SAFGRD >
011615 PAN                            FRAUD
011615 PAN <DELQ STAT =      REASON FOR DELQ = 006          >
011615 PAN                            CURT. OF INCOME
011615 PAN <DELQ STAT =      REASON FOR DELQ = 030          >
```

```
BNKA 0010087930    ____  BANKRUPTCY RECEIPTS  CH 07  INV 38A  01/19/15 15:18:41
RC CHURCH    DUE 12/01/08  PMT   1,940.52  TYPE CONV. RES.    ARM      MAN B
1724 FRANKLIN DR          ENGLEWOOD FL 34223                           GROUP BNK
-DEBT--------------------* POST-PETITION PAYMENTS *-------------PRO FID------
RECEIVED  PP PMTS EFF DATE 1098   CHECK DATE / NUMBER      L/C ADJ  CNT REASON
    .00   00   MM/DD/YY            MM/DD/YY              .00   0
PMTS   PMT AMT      L/C PD     SUSPENSE   NSF PD    ESCROW   ADTL PRIN  OVR
 1     1940.52      .00          .00      .00       .00        .00     1

PP PMT SUSP    PLN 1 AMT  PLN 1 DUE DTE   PLN 2 AMT  PLN 2 DUE DTE
   .00            .00     MM/DD/YY           .00     MM/DD/YY  PMT  1 OF  0
--------------------* PRESS PF2 FOR ADDITIONAL MESSAGES *----------------------
POST-PETITION PAST DUE 241 DAYS      DIST-TYPE = 1 INTEREST-ONLY LOAN
SUSPENDED FORECLOSURE                CH 7
PROC STOP = B  BANKRUPTCY            DISB STOP = 2 INV APPROVAL REQD
-SUSP------------------------------------------------* POST-PETITION *------
TRUSTEE SUSP:          .00           DUE DATE  PAYMENT  LATE CHG
PP PMT SUSP:           .00           12-01-08  1940.52   79.25
DEBTOR SUSP:           .00    00  PP-PMTS
   POST 1 DUE:               PMT
   POST 2 DUE:               PMT
LATE CHARGES DUE:    211.20   NSF FEES DUE:       .00
MSP SUSPENSE:          .00    GRACE DAYS:    PROCESSOR: FIDELITY MANAGED
```

```
BNK1 0010087930   APR1      BNK SETUP     A FID 38A/001   01/19/15  15:18:44
RC CHURCH     CHAPTER 07         12/01/08 TYPE CONV. RES.    ARM      M:B F:4
1724 FRANKLIN DR ENGLEWOOD FL 34223                                  GRP
~STAT-----------------------------* STATUS *-----------------------------------
STAT   PROC    CHAP   FILING DT   BANKRUPTCY CASE #     COURT      TEMPLATE
 A     FID     07     011315      15-00295              CTFLTAMP   CHAP7
 NOTICE       CREDITOR    PF OF CLM    CONFIRM    REPAY   STAY  PMTS   ASSET CONV
 RECEIVED     MEETING     FILING       HEARING    PER     LIFT  INSIDE CASE  DATE
 011415                                                   N     N      N
  TRUSTEE      MTG CO ATTY    DEBTOR ATTY      REGION CODE
 TRFLDAUVAL                   DAFLBLANTO          00
-------------------------* ADDITIONAL MESSAGES *-------------------------------
*** LOAN IS SUSPENDED FORECLOSURE ***  ACTIVE CH 7 BANKRUPTCY
DIST-TYPE = 1 INTEREST-ONLY LOAN
LOAN IS IN FORECLOSURE, F/C STOP = 4   PROC STOP = B  BANKRUPTCY
----~DESC-------------------* BNK DESCRIPTIONS *-------------------------------
 BNK STATUS:  ACTIVE               RMVL REAS:
    CHAPTER:  07                   RMVL DATE:
FOR1 STATUS:  SUSPEND              PREPT DUE: 12-01-08
   TEMPLATE:  CHAPTER 7 BANKRUPTCY PSTPT DUE: 12-01-08
MTG CO ATTY:                       BNK SETUP: 01-19-15
                                   FILING DT: 01-13-15
  PROP INSP:  SAFEGUARD PROPERTIES PROCESSOR: FIDELITY MANAGED
```

```
P190 LN 0010087930        L O A N   S T A T U S  1              01/19/15
NAME RC CHURCH      INV-LN 38A-001-7000063160 DUE 12-01-08 TYPE 13-A
BR CG MAN B P-TYPE 1 INT .0625000 FIRST PB    304,336.00  2ND PB         .00
PDYTD INT        .00 PRIN        .00 TAX       .00 HAZ   1079.00 TERM 360
RECON 139       GUAR                                     .00 LIEN     .00 MAT 05-37
BILL   RICHARD C CHURCH              CONTRACT/POOL NO
NAME                                TAX NAME RICHARD C CHURCH
&    2357 TAMIAMI TRL S UNIT        PROPERTY   1724    FRANKLIN DR
ADDR  VENICE            FL 34293 ADDRESS  ENGLEWOOD              FL 34223
BALANCES              PAYMENT          STOPS          OTHER
ESCROW         .00    P&I      1585.08 PROCESS B      LEVEL SF        .00
ADVANCE   94482.19    2ND P&I      .00 BAD CK  0      SF RATE  .00000000
SUSPENSE       .00    ESCROW    355.44 PIF     0
LC DUE      211.20    REPL         .00 FC      4      LAST ANAL    11-14
REPL RES       .00    MISC         .00 NOTICE  2      LOAN DATE 04-25-07
RES ESC        .00    LIFE         .00 ANALYZE 1      INT/ESC
INT DUE        .00    A&H          .00 A&H     0      TEL 1 941-544-5411
HUD            .00    BSC          .00 LIFE    0      TEL 2 000-000-0000
DEFICIT        .00    TOTAL    1940.52 DISB    2      TEL CD            0
DISC BAL       .00    HUD-P        .00 CASHIER S      TIMES DELQ        3
ORIG DIS       .00    NET PMT  1940.52 ACCRUAL 3      BILL MODE         9
ORIG LOAN  304336     PMT FREQUENCY 12 L/C     2      FC TRACK          S
  ACTIVE B/R -                  P1920010087930    SEE SCREEN P192
```

```
FEE1 0010087930              FEE ACTIVITY LEDGER           01/19/15  15:18:51
SELECTED CODES _____   FROM MMDDYY                          PAGE   1  OF   1
RICHARD C CHURCH                        2357 TAMIAMI TRL S UNIT 119
                                        VENICE
                                                     FL 34293-
```

| FEE CODE | DESCRIPTION | DATE ASSESSED | AMOUNT | DATE PAID | AMOUNT | DATE WAIVED | AMOUNT |
|---|---|---|---|---|---|---|---|
| 1 | LATE CHARGES | 06-04-14 | 79.25 | | | | |
| 6 | PAYOFF QUOTE FEE | | | | | 06-09-14 | 79.25 |
| 6 | PAYOFF QUOTE FEE | 06-16-14 | 79.25 | | | | |
| 1 | LATE CHARGES | | | | | 06-16-14 | 79.25 |
| 1 | LATE CHARGES | 08-18-14 | 70.40 | | | | |
| 1 | LATE CHARGES | 09-16-14 | 70.40 | | | | |
| 1 | LATE CHARGES | 10-16-14 | 70.40 | | | | |

```
NET     211.20    TOTALS     369.70              0.00             158.50
```

```
PCH2 0010087930    HPMT 12/01/08  PAYMENT CHANGE MAINTENANCE  01/19/15 15:18:56
RC CHURCH     1ST PMT 06/01/07  INV 38A/001  TYPE CONV. RES.    ARM     MAN B
              CUR PMT 12/01/08  PB    304,336.00   IR  6.25000          GRP FID
----------------------* HISTORY OF PAYMENTS *-------------------------------
PMT DT    12/01/08         06/01/12          06/01/13          06/01/14
   IR     6.25000          3.25000           3.00000           2.75000
  P&I     1,585.08         1,483.08          1,444.55          1,407.97
COUNTY     372.62           372.62            372.62            372.62
  CITY       0.00             0.00              0.00              0.00
HAZARD      29.14            29.14             29.14             29.14
   MI        0.00             0.00              0.00              0.00
  LIEN      46.32-           46.32-            46.32-            46.32-
   OS        0.00             0.00              0.00              0.00
 MISC        0.00             0.00              0.00              0.00

   A&H       0.00             0.00              0.00              0.00
  LIFE       0.00             0.00              0.00              0.00
  REPL       0.00             0.00              0.00              0.00
   HUD       0.00             0.00              0.00              0.00
 2 P&I       0.00             0.00              0.00              0.00
   NET     1,940.52         1,838.52          1,799.99          1,763.41
PAYMNT                    ADD HISTORY FOR   ADD HISTORY FOR   ADD HISTORY FOR
CHANGE                    ADD HISTORY FOR   ADD HISTORY FOR   ADD HISTORY FOR
REASON
```

http://www.sc-pa.com/testsearch/parcel/details/0477050013



**Bill Furst**
SARASOTA COUNTY
PROPERTY APPRAISER

# Exhibit ___C___

0477050013

**Ownership:**
CHURCH RICHARD C
1724 FRANKLIN DR, ENGLEWOOD, FL, 34223
**Situs Address:**
1724 FRANKLIN DR, ENGLEWOOD, FL, 34223

| | |
|---|---|
| **Land Area:** | 51,152 Sq.Ft. |
| **Municipality:** | Sarasota County |
| **Subdivision:** | 0000 - NOT PART OF A SUBDIVISION |
| **Property Use:** | 0100 - Single Family Detached |
| **Status** | OPEN |
| **Sec/Twp/Rge:** | 10-40S-19E |
| **Census:** | 121150026012 |
| **Zoning:** | RE2 - RESIDENTIAL ESTATE (1UNIT/ACRE) |
| **Total Living Units:** | 1 |

**Parcel Description:**  COM AT SE COR OF FRANKLIN DR TH S-89-53-
175 FT FOR POB TH S-89-53-40-E 155 TH N-00-31-05-E 330.01 FT T
N-89-53-40-W 155 FT TH S-00-31-05-W 330.01 FT TO POB, CONTAINI
1.1 C-AC M/L, ORI 2002172211

**Buildings**

| Situs - click address for details | Bldg # | Beds | Baths | Half Baths | Year Built | Gross Area | Living Area | St |
|---|---|---|---|---|---|---|---|---|
| 1724 FRANKLIN DR, ENGLEWOOD, FL, 34223 | 1 | 4 | 3 | 0 | 2004 | 4865 | 3539 | |

**Extra Features**

| line # | Building Number | Description | Units | Unit Type | Year |
|---|---|---|---|---|---|
| 1 | 1 | CAGE - Screened Enclosure | 1647 | SF | 20 |
| 2 | 1 | DECK - Deck - Frame or Masonry | 192 | SF | 20 |
| 3 | 1 | POOL - Swimming Pool | 540 | SF | 20 |
| 4 | 1 | SPA - Spa/Whirlpool | 38 | SF | 20 |

**Values**

| Year | Land | Building | Extra Feature | Just | Assessed | Exemptions | Taxable | Cap |
|---|---|---|---|---|---|---|---|---|
| 2014 | $77,400 | $285,900 | $35,400 | $398,700 | $351,173 | $50,000 | $301,173 | $47 |
| 2013 | $65,700 | $259,500 | $31,000 | $356,200 | $345,983 | $50,000 | $295,983 | $10 |
| 2012 | $70,000 | $270,200 | $27,400 | $340,200 | $340,200 | $50,000 | $290,200 | $ |
| 2011 | $72,100 | $277,100 | $27,700 | $349,200 | $349,200 | $50,000 | $299,200 | $ |
| 2010 | $89,100 | $295,900 | $28,100 | $385,000 | $385,000 | $50,000 | $335,000 | $ |
| 2009 | $106,000 | $305,700 | $24,300 | $411,700 | $411,700 | $50,000 | $361,700 | $ |
| 2008 | $124,700 | $388,500 | $15,400 | $513,200 | $513,200 | $50,000 | $463,200 | $ |
| 2007 | $153,500 | $478,100 | $15,400 | $631,600 | $631,600 | $25,000 | $606,600 | $ |
| 2006 | $173,400 | $540,100 | $15,400 | $713,500 | $713,500 | $25,000 | $688,500 | $ |

**Current Exemptions**

| Grant Year | Description | Value |
|---|---|---|
| 2006 | 999 - ADDITIONAL HOMESTEAD EXEMPTION | $25,000.0 |
| 2006 | 910 - CONSTITUTIONAL HOMESTEAD | $25,000.0 |

**Sales & Transfers**

| Transfer Date | Recorded Consideration | Instrument Number | Qualification Code | Grantor/Seller | Instrument Ty |
|---|---|---|---|---|---|
| 8/31/2004 | $100 | 2004228411 | 11 | CHURCH,RICHARD C | QC |
| 10/17/2002 | $125,000 | 2002172210 | X3 | CUTSINGER,EVAN R | WD |

**Associated Tangible Accounts**

There are no associated tangible accounts for this parcel